IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALERIE BARBER and ROBERT HAMILTON, individually and as Successors in Interest for JESSE HAMILTON, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SANTA ROSA; COUNTY OF SONOMA; EDWIN FLINT, in his capacity as Chief of Police for the City of San Rosa; GREGORY YAEGER, individually and in his capacity as an officer of the City of Santa Rosa; MICHAEL HEISER, individually and in his capacity as an officer of the City of Santa Rosa; GREGG AYER, individually and in his capacity as an officer of the City of Santa Rosa; TELECARE CORPORATION, and JAMES M. KENNEDY, M.D.<br><br>Defendants. | No. C-08-5649 MMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Before the Court is the Motion for Summary Judgment filed August 30, 2010 by defendants City of Santa Rosa, Edwin Flint, Gregory Yaeger, Michael Heiser, and Gregg Ayer ("City defendants").[1] Plaintiffs Valerie Barber and Robert Hamilton have filed

---

[1] Defendants County of Sonoma and James M. Kennedy, M.D. were dismissed from this matter by Court orders filed October 22, 2010.  Defendant Telecare Corporation has neither filed a dispositive motion nor joined in defendants' Motion.

opposition, to which City defendants have filed a reply. The matter came on regularly for hearing on October 8, 2010. J. Wynne Herron of Herron & Herron appeared on behalf of plaintiffs; Matthew LeBlanc, City Attorney for the City of Santa Rosa, appeared on behalf of City defendants.[2] With leave of Court, the parties filed supplemental briefing. Having considered the papers filed in support of and in opposition to the motion, and the arguments of counsel, the Court rules as follows.[3]

## BACKGROUND[4]

Plaintiffs are the natural parents of Jesse Hamilton ("Hamilton"), a mentally ill individual who was fatally shot by Santa Rosa police officers on January 2, 2008. Hamilton suffered from schizophrenia. At the time of the shooting, the County of Sonoma was Hamilton's court-appointed conservator, and Hamilton was residing in a group home operated by Telecare Corporation ("Telecare"), a provider of mental healthcare services and responsible for Hamilton's care as well as the care of other individuals residing in the group home.

On the day in question, Deborah Steen ("Steen"), an employee of Telecare, called the Santa Rosa Police Department after William Shoff ("Shoff"), a resident of the group home, came to Steen's office, appeared shaken, and informed Steen that Hamilton was in Hamilton's room with a knife. At about the same time, Alex Kennett ("Kennett"), an employee of Telecare who worked with Steen, received a call from Jason Saunders ("Saunders"), another resident, that Hamilton "was in [Hamilton's] room with a knife and yelling about slashing and dying." (See Steen Dep. 37:7-8.)[5]

---

[2] Also present was James Geary of Hanson Bridgett, counsel for Telecare Corporation.

[3] By order filed November 30, 2010, the Court vacated the hearing set for December 3, 2010.

[4] The facts set forth below are either undisputed or read in the light most favorable to plaintiffs.

[5] Both parties have submitted deposition excerpts. Unless otherwise noted, all citations herein to depositions are to the exhibits attached to City defendant's motion.

2

Steen dialed 911 and informed police dispatch: "I have one of my clients who is chasing other clients around with a butcher knife." (See Motion Ex. 1, at 1 (911 call transcript).) Steen further informed dispatch that Hamilton was a client of Telecare, that he was "schizo-affective," and that although he had taken his medication that morning, he had not done so for the previous five days. Steen also informed dispatch that Hamilton resided in a group home with five other clients, and that she did not know whether other residents remained in the house with Hamilton.

Santa Rosa police officer Gregory Yaeger ("Officer Yaeger" or "Yaeger") was dispatched to the group home. Officer Yaeger was advised by police dispatch that there was a fight or disturbance at the home and that one of the parties was armed with a knife. Yaeger was the first officer to arrive on the scene. While at the front door, Yaeger could not hear or see anything to indicate a fight or disturbance. After knocking, Yaeger noticed the door was slightly ajar, and pushed it open to reveal a long hallway. Yaeger then announced his presence, stating he was a police officer. As Yaeger began moving down the hallway, he encountered a resident, later identified as Saunders, who informed Yaeger that Hamilton had been acting out and that Hamilton had a knife; he pointed Yaeger toward Hamilton's bedroom door. Saunders then left the hall to wait on the front porch.

Yaeger knocked on Hamilton's bedroom door, announcing himself as a police officer. In response, Hamilton, "obviously agitated," began yelling "at the top of his lungs." (Yaeger Dep. 89:19-21, 94:12.) Yaeger could only make out the words "slash" or "slashing." (See id. at 89:15-16.) Yaeger "thought it was possible that [Hamilton] was emotionally disturbed." (Id. at 92:3-4.)

Yaeger, now concerned for his own safety, left the residence to put distance between himself and Hamilton's room. Once outside, Yaeger was joined by Santa Rosa police officer Michael Heiser ("Officer Heiser" or "Heiser"), who also had responded to dispatch's call. While Heiser watched the front door, Yaeger went around to the side of the building in an attempt to look into Hamilton's window and confirm whether Hamilton had a knife and to determine whether anyone else was in the room with him. Yaeger's efforts in

3

1 that regard were unsuccessful, as the view through the window was blocked.

2      Yaeger returned to the front of the residence, where Santa Rosa police officer Gregg
3 Ayer ("Officer Ayer" or "Ayer") had joined Officer Heiser; shortly thereafter, Kennett arrived.
4 Kennett informed the three officers of Hamilton's mental condition, specifically, that
5 Hamilton suffered form a "mental handicap" (see Yaeger Dep. 92:18-25), and confirmed
6 that Hamilton had not taken his medication as prescribed (see Kennett Dep. 99:21-100:7).
7 Also at that time, another individual exited the residence and informed Heiser that "he had
8 been threatened by Jesse Hamilton earlier in the day with a knife." (See Heiser Dep. 10:5-
9 8.)

10      Kennett informed the officers that he had a good "rapport" with Hamilton and that he
11 might be able to "get a line of communication going with [Hamilton]." (Yaeger Dep. 105:19-
12 23; accord Kennett Dep. 102:9-17.) The officers, believing that Kennett might be able to
13 bring the situation to a peaceful end, entered the home with him. While in the hallway, Ayer
14 and Yaeger drew their tasers; Heiser, who was not equipped with a taser but was equipped
15 with a service weapon, kept his weapon holstered. With the officers positioned in the hall
16 behind him, Kennett knocked on Hamilton's door and explained to Hamilton that he needed
17 to speak with him and that he should come out of his room.

18      In response, Hamilton again began to yell, screaming "You're all going to burn,
19 Mother Fuckers." (Kennett Dep. 103:9.) Hamilton opened the door, holding a knife above
20 his head. Kennett, believing himself to be "in danger" (id. at 105:14), retreated past the
21 officers to the porch, where he could still see Hamilton and the officers.

22      Shortly thereafter, Hamilton exited his room and entered the hallway with a butcher
23 knife "raised around his head" and "with the blade pointed downwards" and "towards the
24 officers." (See Heiser Dep. 14:5-8; Yaeger Dep. 171:17-18.)[6] Hamilton continued to
25 appear "agitated," yelling "slashing, slashing, slashing." (Kennett Dep. 103:19, 104:2-3.)

26

---

27    [6] Although there is some question whether Hamilton's other hand may also have
28 been in a raised position (see Heiser Dep. 14:5-8), it is clear Hamilton was not surrendering (see Yaeger Dep. 177:1-9).

4

The officers ordered Hamilton to "drop the knife and to get on the ground." (See id. at 14:14-15.) Hamilton did not comply with the order. Instead, he "started to advance on [the officers]" with "constant forward movement" (see Yaeger Dep. 168:13; Kennett Dep. 104:22-23) and with the knife raised above his head. When Hamilton was between ten and fifteen feet away, Officer Yaeger shot Hamilton with a taser and, shortly thereafter,[7] Officer Heiser, "fear[ing] for Officer Yaeger's safety, as well as Officer Ayer and [himself] and Mr. Kennett," fired four shots at Hamilton with his service weapon (see Heiser Dep. 16:11-13, 16:15), hitting Hamilton in the upper thigh and torso.

Hamilton fell forward with his hands underneath him, and the officers, not knowing whether Hamilton still possessed the knife, struggled to pull Hamilton's hands behind his back so that they could handcuff him. During the course of the struggle, Officer Ayer applied contact tases to Hamilton, whereupon the officers were able to gain control of Hamilton's arms and handcuff him. Medical aid was immediately called to the scene, and, before their arrival, Officers Ayer and Yaeger themselves attempted to render aid, but Hamilton died later that day from his injuries. Plaintiffs thereafter filed the instant action.

As against City defendants, plaintiffs bring the action under 42 U.S.C. § 1983, alleging Officers Yaeger, Heiser, and Ayer, as well as Edwin Flint, Chief of Police ("Chief Flint"), violated their son's Fourth Amendment rights by using excessive and unnecessary force and that the City of Santa Rosa and Chief Flint exhibited deliberate indifference toward their son by failing to properly institute training for police officers with respect to interactions with mentally ill individuals. Additionally, plaintiffs allege as against all City defendants claims on plaintiffs' own behalf, specifically, for deprivation of familial relationship under § 1983, and wrongful death under state law.

**LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant

---

[7] The Court addresses below the parties' dispute as to the amount of time elapsing between the two officers' responses.

summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c).

The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact. Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." See Celotex, 477 U.S. at 324 (internal quotation and citation omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted). "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion." See Matsushita, 475 U.S. at 587 (internal quotation and citation omitted).

**DISCUSSION**

City defendants argue there is no constitutional or other violation, and thus they are entitled to summary judgment on each of the causes of action asserted against them; alternatively, Officers Yaeger, Heiser, and Ayer assert they are entitled to qualified immunity.

**A.     Fourth Amendment Claims**

Claims of excessive force, including deadly force, that arise in the context of an arrest, investigatory stop or other "seizure" of a person are analyzed under the Fourth Amendment and its reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989). While excessive force claims generally present questions of fact for the jury, such

claims may be decided as a matter of law "if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994). Summary judgment in such cases "should be granted sparingly," however, because the inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002).

"[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question in such a determination is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. Determining whether a particular use of force is reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (quoting United States v. Place, 462 U.S. 696, 703 (1983)). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." Id. at 396–97.

For purposes of the "reasonableness inquiry," factors to be considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. Of these three factors, the "most important single element" is "whether the suspect poses an immediate threat to the safety of the officers or others." Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir.2005) (quoting Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir. 1994)). Although "the availability of alternative methods of capturing or subduing a suspect" may also be considered, Smith, 394 F.3d at 703, police officers "need not avail themselves of the least intrusive means of responding and need only act within

1 the range of conduct [the Ninth Circuit] [has] identi[ed] as reasonable," Billington v. Smith,
2 292 F.3d 1177, 1188–89 (9th Cir. 2002) (internal quotation and citation omitted).  Another
3 factor to be considered in applying the Graham balancing test is "the giving of a warning or
4 the failure to do so."  Deorle v. Rutherford, 272 F.3d 1272, 1284 (9th Cir. 2001).
5 Additionally, "where it is or should be apparent to the officers that the individual involved is
6 emotionally disturbed," such circumstance "is a factor that must be considered in
7 determining, under Graham, the reasonableness of the force employed."  Id. at 1283.

### 1. Officer Heiser's Use of Deadly Force

Plaintiffs argue that Officer Heiser used excessive force in firing upon Hamilton instead of waiting to see if the taser deployed by Officer Yaeger would have the effect of subduing him.[8]

In considering such argument, the Court, at the outset, notes that it is "not constitutionally unreasonable" for a police officer to use deadly force where he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."  Tennessee v. Garner, 471 U.S. 1, 9, 11 (1985).

Here, City defendants have submitted evidence, in the form of sworn testimony by Kennett and the three officers, that Officer Yaeger's taser had "absolutely no effect" on Hamilton, who continued to "charge [the officers] with the knife" until Officer Heiser fired his service weapon.  (See Ayer Dep. 13:25-14:21; accord Heiser Dep. 15:16-16:23; Yaeger Dep. 177:13-15; Kennett Dep. 110:13-111:5.)

In considering such evidence, the Court finds Blanford v. Sacramento County, 406 F.3d 1110 (9th Cir. 2005), instructive.  In Blanford, the county sheriff's department received reports that a man wearing a ski mask and carrying a sword was walking through a

---

[8] Although Officers Ayer and Yaeger were present, plaintiffs do not argue, and the facts do not show, that either such officer participated in the shooting.  Officers who are present at the deployment of deadly force, but do not participate in the deployment, cannot be held liable for harm resulting therefrom.  See Jones v. Williams, 297 F.3d 930, 936 (9th Cir. 2002). Similarly, Chief Flint cannot be held responsible for any such use of force.  See Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (affirming summary judgment in favor of police chief where no showing he "was personally involved in the incident").  The question of Chief Flint's liability based on failure to train is discussed below.

1  suburban residential neighborhood and acting erratically.  The defendant deputy sheriffs
2  reported to the scene, where they confronted Blanford, who matched the description
3  provided.  The deputies drew their weapons and ordered Blanford to drop the sword.
4  Blanford failed to respond to the deputies' commands.  When the deputies threatened to
5  shoot Blanford if he failed to drop his sword, Blanford raised the sword and made a loud
6  growling sound.  The deputies considered whether Blanford might be mentally disturbed,
7  but, due to Blanford's behavior and his being armed, were concerned for their safety and
8  the safety of others in the area.  When Blanford approached a private residence with an
9  apparent intent to enter, deputies shot him, rendering him a paraplegic.  The entire
10 encounter lasted approximately two minutes.  After the above-described events, the
11 deputies learned Blanford apparently had not heard their commands as he was wearing
12 headphones and listening to music at a high volume, and they also learned that the home
13 he was attempting to enter was the residence he shared with his parents.  406 F.3d at
14 1112–14.

15         The Ninth Circuit affirmed the district court's grant of summary judgment on behalf of
16 the defendants.  The Ninth Circuit found the deputies "had cause to believe that Blanford
17 posed a serious danger to themselves or anyone in the house or yard that he was intent
18 upon accessing, because he failed to heed warnings or commands and was armed with an
19 edged weapon that he refused to put down."  406 F.3d at 1116.  The Circuit Court further
20 found that, although the likelihood that Blanford was emotionally disturbed was a factor to
21 be weighed in determining a reasonable level of force, "Blanford was armed with a
22 dangerous weapon and it was not objectively unreasonable for them to consider that
23 securing the sword was a priority."  406 F.3d at 1117.

24         Here, similarly, Hamilton, although appearing to be emotionally disturbed, was
25 agitated, was armed with a sharp blade, specifically a butcher knife, and failed to respond
26 to law enforcement officers' commands that he drop the knife.  Moreover, Hamilton
27 presented a greater threat than Blanford, as Hamilton had already threatened his
28 housemates and was only a short distance from and advancing toward the officers, as well

9

1 as Kennett, who was behind them.

2 The instant case is distinguishable from Herrera v. Las Vegas Metro Police, 298 F. Supp. 2d 1043 (D. Nev. 2004), the case on which plaintiffs principally rely. In Herrera, the district court found a triable issue based on the following evidence submitted by the plaintiffs. Police officers entered the decedent Herrera's home knowing he was there alone and that he was mentally disturbed. Although Herrera was armed with "a small paring knife," he "was not moving toward the officers." Id. at 1047-48. Nevertheless, the officers "shot [him] with . . . bean bag rounds," id. at 1050, and while he "was doubled-over with pain," the officers deployed pepper spray, id. Finally, the officers shot and killed Herrera while he was "merely standing with the knife pointed skyward, stunned, for nearly a full minute." Id. In this case, and unlike in Herrera, the officers did not know whether other individuals remained in the home. Further, unlike in Herrera, Hamilton was advancing toward the officers with a butcher knife raised in an attack position, while at the same time making verbal threats.

Accordingly, based on the evidence submitted by City defendants, the Court finds Officer Heiser's use of deadly force was not, as a matter of law, excessive.

Plaintiffs argue that Officer Heiser nonetheless unnecessarily fired his weapon, because Yaeger had already deployed a taser. In that regard, plaintiffs dispute Kennett's and the officers' description of the shooting in two respects: (1) the effect the taser had on Hamilton, and (2) the amount of time that elapsed between the use of the taser and Heiser's firing of his service weapon.

**a.    Effect of the Taser**

Plaintiffs first assert, contrary to the sworn testimony of the officers and Kennett (see Ayer Dep. 13:25-14:21; Heiser Dep. 15:16-16:23; Yaeger Dep. 177:13-15; Kennett Dep. 110:13-111:5), that the taser effectively and immediately incapacitated Hamilton, eliminating the need to use deadly force. In support of such contention, plaintiffs submit the report of their expert Roger Clark ("Clark"), who opines that "the Taser weapon . . . causes instant involuntary incapacitation" and "[t]he use of the Taser in this case would have

1 caused an instant and complete involuntary incapacitation to . . . Hamilton's ability to
2 control himself." (See Clark Decl. Ex. A, at 16 (emphasis in original).)[9]  City defendants
3 object to the admissibility of Clark's opinion as to the effect of Yaeger's taser on Hamilton,
4 on the ground that such opinion fails to meet the requirements of Daubert and Rule 702 of
5 the Federal Rules of Evidence.

Under the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Additionally, courts considering the admissibility of a purported expert's opinion may consider "whether the 'theory or technique . . . can be (and has been tested)'; whether it 'has been subjected to peer review and publication'; whether, in respect to the particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation'; and whether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'"  Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 149-50 (1999) (citing Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-94 (1993)).

According to Clark's report, he is a veteran police officer, who served in a number of positions, and who possesses a California Peace Officer Standards Training (POST) Advanced Certificate and is a graduate of the POST Command College. (See Clark. Decl. Ex. A, at 16.) Clark is not an expert in medicine, biomedicine, pathology, physiology, toxicology, biomechanical engineering, electrical engineering, electrocardiology, or

---

[9] Clark further opines on the reasonableness of force used by the officers.  (See Clark Decl. Ex. A, at 15.)  Whether the officers' actions were "objectively reasonable" in light of the facts and circumstances confronting them, see Graham, 490 U.S. at 397, is, however, a question for the jury or, if no material facts are in dispute, for the Court, see Scott, 39 F.3d at 397; see, e.g., Aguilar v. Int'l Longshoremen's Union Local No. 10, 966 F.2d 443, 447 (9th Cir. 1992) (rejecting expert opinion as to reasonableness of plaintiffs' reliance on defendant's promise).

electrophysiology, nor has he conducted or authored any studies related to tasers. (See Clark Dep. 13:12-22:3, 158:21-159:22 (attached as exhibit to Suppl. Brief of City Defs. in Supp. of Mot. for Summ. J.).) Clark does not "claim to have any scientific, technical or any other specialized knowledge regarding the success rate of electronic-controlled devices or tasers." (See id. at 160:11-15.) Clark claims expertise only as to "the general use and deployment of the taser," specifically "the features of the weapon, such as it has a memory chip, how it cycles, the features of the cartridge." (See id. at 31:9-11, 32:7-12.) Consequently, even assuming Clark's qualification to offer an opinion as to the general use and deployment of tasers, plaintiffs fail to show he qualifies as an expert on the physiological effect of Officer Yaeger's taser on Hamilton.

Moreover, even assuming Clark was so qualified, plaintiffs provide no evidence to support a conclusion that Clark's "(1) testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) [Clark] has applied the principles and methods reliably to the facts of the case." See Fed. R. Evid. 702. Clark does not purport to have any personal experience as to the effects of tasers, let alone experience sufficient to allow for reasonable extrapolation. (See Clark Dep. 170:5-8 (acknowledging that "while working with the Los Angeles County Sheriff's Department, [he] never personally deployed a taser device in the field").) Rather, the sole basis of Clark's opinion is that he has "seen studies" indicating tasers are "three-percent unsuccessful." (See id. at 161:14-15, 162:6-11, 163:5-6.) Further, plaintiffs have neither identified with specificity nor submitted such materials, and thus fail to show a "known or potential rate of error," their "general acceptance," or whether Clark has applied them "reliably to the facts of the case." See Fed. R. Evid. 702; Daubert, 509 U.S. at 593-94.

In sum, the Court finds Clark is not qualified to offer an opinion as to the effect of Yaeger's taser on Hamilton, and, accordingly, sustains City defendants' objection thereto. Plaintiffs submit no other evidence as to the effect of the taser on Hamilton.

Accordingly, plaintiffs fail to raise a triable issue with respect to the effect of the taser.

### b. Time Between Use of Taser and Shooting

Plaintiffs next assert, contrary to the sworn testimony of the officers and Kennett (see Ayer Dep. 13:25-14:21; Heiser Dep. 15:16-16:23; Yaeger Dep. 177:13-15; Kennett Dep. 110:13-111:5), that Heiser fired almost immediately after Yaeger deployed his taser. In support of such assertion, plaintiffs' submit the report of their expert Gregg M. Stutchman ("Stutchman"), who purports to analyze the sounds recorded on an open phone line between the group home and police dispatch, which recorded the incident. Stutchman concludes that only .578 seconds elapsed between the time the taser activated and the time the first shot was fired. (See Stutchman Decl. Ex. A, at 4.) On the basis of Stutchman's opinion, plaintiffs assert that Officer Heiser did not wait to see the effect of the taser on Hamilton, and Heiser's use of force thus was unreasonable.[10]

The Court is mindful that the availability of less intrusive methods capable of subduing a suspect is a factor to be weighed. Nevertheless, the Court is also mindful that police need not avail themselves of the least intrusive method available, see Billington, 292 F.3d at 1188–89, and that the most important element for the Court to consider is "whether the suspect poses an immediate threat to the safety of the officers or others," see Smith, 394 F.3d at 702.

Here, plaintiffs' proffered opinion evidence that Yaeger and Heiser fired essentially simultaneously does not show that Heiser, at that moment, was unreasonable in his fear for his safety and the safety of others; it only shows that the taser, at the moment Heiser fired his weapon, had not lessened the threat Hamilton posed. An officer is under no duty to deploy a lesser degree of force where it is objectively reasonable to employ deadly force. Billington, 292 F.3d at 1188–89. Under the circumstances presented here, assuming Stutchman is correct as to the timing, Heiser had no duty to wait to see the effect of the

---

[10] Defendant's object to Stutchman's expert report as failing to meet the requirements set forth in Daubert, 509 U.S. 579. As discussed below, the report does not alter the determination reached by the Court, and, consequently, its admissibility is not addressed herein.

taser before firing his weapon, given the short distance between the officers and an armed and advancing Hamilton, as well as the risk of serious injury or death to others in the residence.

Accordingly, plaintiffs fail, under either of the above-described theories, whether considered conjunctively or in the alternative, to raise a triable issue on their claim that Heiser's use of deadly force was excessive.

### 2.  Subsequent Use of Force

Plaintiffs contend the officers used excessive force in restraining Hamilton after he had been shot, specifically, by holding him down, administering contact tases, and handcuffing him.[11]  As discussed above, it is undisputed that Hamilton continued to resist or appeared to be resisting the officers and that the officers remained in fear for their safety as they could not locate the knife Hamilton was holding just moments earlier. Consequently, despite having been shot, Hamilton continued to pose a threat to the safety of the officers.  Under such circumstances, the officers were reasonable in applying what was no more than an intermediate level of force in an effort to handcuff Hamilton and thereby neutralize the threat he continued to pose.  See Bryan v. MacPherson, No. 08-55622, 2010 WL 4925422, at *16 (9th Cir. Nov. 30, 2010) (finding deployment of taser, in dart mode, constitutes "intermediate" level of force).  Once Hamilton was handcuffed and the knife was located, the officers ceased using force against him, and immediately called for medical assistance.

Accordingly, plaintiffs fail to raise a triable issue on their claim that the officers used excessive force in subduing Hamilton after he was shot.

### 3.  Provocation

Plaintiffs contend that even if Officers Yaeger, Heiser, and Ayer acted reasonably

---

[11] Although plaintiffs name Chief Flint in their claim for excessive force, the record contains no evidence to show either his "personal involvement in the constitutional deprivation" or a "sufficient causal connection" between any action on his part and the officers' use of force.  Hansen, 885 F.2d at 646 (9th Cir. 1989).  The question of Chief Flint's liability based on failure to train is discussed below.

14

once inside the group home, they acted unreasonably at the outset by entering without waiting for Hamilton to "decompress" and for a trained negotiator to arrive. (See Pls.' Opp. 6.)

Even if an eventual use of force is reasonable, "where an officer intentionally or recklessly provokes violent confrontation, if the provocation is an independent Fourth Amendment violation, [the officer] may be held liable for his otherwise defensive use of deadly force." Billington, 292 F.3d at 1189; accord Espinosa v. City and Cnty. of San Francisco, 598 F.3d 528, 539 (9th Cir. 2010) (affirming denial of summary judgment where officer entered victim's home unlawfully, thereby provoking deadly confrontation); Alexander v. City and Cnty. of San Francisco, 29 F.3d 1355, 1366–67 (9th Cir. 1994) (finding triable issue as to provocation where shooting admittedly was in self defense, but officers unlawfully entered home of individual whom they knew to be mentally ill and who had committed no crime). A plaintiff, however, "cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." Billington, 292 at 1190.

Here, although the officers did not have a warrant, they lawfully entered the group home based on exigent circumstances. "Exigent circumstances are defined as those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons . . . or some other consequence improperly frustrating legitimate law enforcement efforts." U.S. v. Lindsey, 877 F.2d 777, 780–81 (9th Cir. 1989) (internal quotations and citations omitted); see also Fisher v. City of San Jose, 558 F.3d 1069, 1077 (9th Cir. 2009) (finding officer's entry of home lawful where "exigent circumstances" existed, even though home already surrounded by police officers). In particular, the officers were summoned by persons employed by the operator of the group residence, and Hamilton reportedly was inside his room, armed with a butcher knife. The officers could not be sure as to whether other individuals were inside Hamilton's room and in danger, or whether Hamilton would injure himself. Moreover, the officers did not attempt to enter Hamilton's room, where he had barricaded himself, but,

rather, waited outside in the common hallway. Further, when the officers entered the group home, they did so only when accompanied by Kennett, a representative of Hamilton's health care provider, who reportedly had a rapport with Hamilton, and who "could . . . calm him down and resolve the situation peacefully." (Ayer Dep. 10:20-22.) While, concededly, one can conceive of the possibility that Hamilton's death could have been avoided if the officers had remained outside the home, a proper analysis excludes such efforts to second-guess what was, at the time, a reasonable decision. Graham, U.S. 386 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.")

Accordingly, plaintiffs fail to raise a triable issue with respect to provocation, and, consequently, fail to raise a triable issue on their claim that Officers Yaeger, Heiser, and Ayer violated Hamilton's rights under the Fourth Amendment.

### 4. Municipal Liability: Deliberate Indifference

Plaintiffs assert the City of Santa Rosa and Chief Flint[12] violated their son's Fourth Amendment rights by failing to properly train the City's police officers with respect to their interactions with mentally ill individuals. A failure to adequately train law enforcement personnel may amount to a violation of a plaintiff's constitutional rights "where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). "[T]he liability of municipalities," however, "is contingent on a violation of constitutional rights" by an individual officer. Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994). "If there was no constitutional violation of [the plaintiff's] rights, there is 'no basis for finding the officers inadequately trained.'" Long v. City and Cnty. of Honolulu, 511 F.3d 901, 907 (9th Cir. 2007) (citing Scott, 39 F.3d at 916)). As discussed above, plaintiffs have failed to show a violation of Hamilton's rights by any of the individual defendant officers.

---

[12] On their cause of action for deliberate indifference, plaintiffs name Chief Flint in his official capacity. "Official capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985).

Accordingly, plaintiffs fail to raise a triable issue on their claim of deliberate indifference by the City of Santa Rosa and Chief Flint.

**B.     Loss of Familial Relationship**

Plaintiffs also assert, as against all City defendants, a claim under § 1983 for loss of their familial relationship with their son as a result of Officer Heiser's use of force. A parent's interest in his or her familial association with a child is protected by the Due Process Clause of the Fourteenth Amendment. Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991). Only official conduct that "shocks the conscience," however, is cognizable as a due process violation. Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846, 854-55 (1998). Where officers must "act decisively" and "without the luxury of a second chance" to address a life-threatening situation, their conduct "shocks the conscience" only where such officers acted with a "purpose to harm" that was "unrelated to the legitimate use of force necessary to protect the public and themselves." Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 372-73 (9th Cir. 1998).

Because, as discussed above, plaintiffs have failed to raise a triable issue with respect to their claim that the defendant officers used excessive force, the officers' conduct, as a matter of law, cannot be deemed to "shock the conscience."

Accordingly, plaintiffs have failed to raise a triable issue with respect to their claim under the Due Process Clause.

**C.     Wrongful Death**

Lastly, plaintiffs assert, on their own behalf and against all City defendants, a state law wrongful death claim.[13] Under California law, police officers have "a duty to use reasonable care in employing deadly force." Munoz v. City of Union City, 120 Cal. App. 4th 1077, 1101 (Cal. Ct. App. 2004). There is no dispute that Officer Heiser owed Hamilton a duty to use reasonable care when employing deadly force against him. As discussed

---

[13]As discussed above, there is no evidence showing any of the City defendants other than Heiser participated in the use of deadly force, and, consequently, such other defendants cannot be held liable for any claim based on wrongful death or loss of familial relationship. See Jones, 297 F.3d at 936.

17

above, however, the record here demonstrates, as a matter of law, that Heiser's use of force was reasonable under the Fourth Amendment. In evaluating a tort claim based on an officer's allegedly negligent use of deadly force, California courts apply the same standard as is applicable under the Fourth Amendment. See id. at 1102 n.6.

Accordingly, plaintiffs fail to raise a triable issue with respect to their wrongful death claim.

## CONCLUSION

For the reasons stated above, City defendants' motion for summary judgment is hereby GRANTED.

**IT IS SO ORDERED.**

Dated: December 7, 2010

MAXINE M. CHESNEY
United States District Judge